UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROHM AND HAAS ELECTRONIC    *
MATERIALS, LLC,    *
   *
       Plaintiff,    *
   *
      v.    *     Civil Action No. 10-10563-JLT
   *
ELECTRONIC CIRCUITS    *
SUPPLIES, INC.,    *
   *
       Defendant.    *

MEMORANDUM

December 22, 2010

TAURO, J.

I.     Introduction

Rohm and Haas Electronic Materials, LLC ("Plaintiff") asserts that Electronic Circuits Supplies, Inc. ("Defendant"), a former distributor of one of Plaintiff's goods, committed fraud and deceit by deleting a material term in a prior non-competition provision while the Parties were amending another portion of their distributorship agreement. Plaintiff also claims that Defendant is misappropriating Plaintiff's goodwill and confidential information by breaching the Parties' agreement. Presently at issue is Plaintiff's Motion for Preliminary Injunction [#3]. Plaintiff seeks to enjoin Defendant and its agents, representatives or other persons authorized to speak or act on Defendant's behalf from selling the same, similar, or competitive products to Plaintiff's customers for one year. For the following reasons, Plaintiff's Motion for Preliminary Injunction is DENIED.

II.     Background

Most of the material facts are undisputed.[1]  Plaintiff manufactures and distributes electronic products that are used in manufacturing printed circuit boards.[2]  Prior to December 31, 2007, Plaintiff sold some of its products directly to customers and also used a network of exclusive distributors.[3]  Plaintiff's network of distributors is responsible for maintaining direct relationships with customers by providing logistical and technical support to the customers.  The distributors purchase products from Plaintiff and sell the products to customers.[4]  Plaintiff has around 15,000 employees and generated sales nearing nine billion dollars in 2007.[5]  Plaintiff is a subsidiary of Dow Chemicals, and Dow has 46,000 employees and generates annual sales around fifty billion dollars per year.[6]

Since 1991, Defendant has had a network of customers in the Mid-Atlantic and New

---

[1] Those facts that are in dispute are noted below.

[2] Pl.'s Mem. Supp. Mot. Prelim. Inj., 1 [#4] [hereinafter Pl.'s Mem.].  This court accepts as true Plaintiff's well-pleaded allegations and uncontroverted affidavits.  Elrod v. Burns, 427 U.S. 347, 350 n.1 (1975) ("For purposes of our review, all of the well-pleaded allegations of respondents' complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true.").

[3] Pl.'s Mem., 3 [#4].

[4] Decl. Hal Thrasher, 2, Mar. 19, 2010 [#5] [hereinafter Thrasher Decl.].

[5] See Aff. Martin Georgia, 2, June 3, 2010 [#13] [hereinafter Georgia Aff.]; see also Press Release, The Dow Chemical Company, Dow Acquired Rohm and Haas, Creating World's Leading Speciality Chemicals and Advanced Materials Company (July 10, 2008), available at www.dow.com/news/corporate/2008/20080710b.htm.

[6] Georgia Aff., 2 [#13]; Press Release, The Dow Chemical Company, Dow Acquired Rohm and Haas, Creating World's Leading Speciality Chemicals and Advanced Materials Company (July 10, 2008), available at www.dow.com/news/corporate/2008/20080710b.htm.  In 2009, Dow's annual sales were slightly down to around forty-seven billion dollars.  See 2010 Proxy Materials, The Dow Chemical Company, 2010 Databook, available at www.dow.com/financial/pdfs/databook_051210.pdf

England regions on behalf of chemical manufacturers, including those creating chemicals for use in circuit boards and chemical milling industries.[7] Defendant has five employees, including its President and co-owner.[8] Defendant generates around four million dollars in revenue per year.[9] Defendant was Plaintiff's distributor for certain customer accounts.[10]

A. The Parties' Agreement

Plaintiff entered into an Amended and Restated Distributor Agreement ("Agreement") with Defendant, which made Defendant the exclusive distributor of Plaintiff's products in a specific territory that included New Jersey, New York, Pennsylvania, and Virginia ("Territory").[11] Massachusetts law governed the Agreement.[12]

In the Agreement, Defendant agreed not to sell products that competed with Plaintiff's products during the period of the Agreement and for twelve months following its termination.[13] Additionally, Defendant would not be allowed to sell competitive products as long as Defendant

---

[7] Georgia Aff., 1 [#13].

[8] Georgia Aff., 1–2 [#13].

[9] See Georgia Aff., 1–2 [#13].

[10] Thrasher Decl., 2 [#5]. Over fifty percent of Defendant's business was comprised of Plaintiff's products, at least during the Parties' exclusive distributorship agreement. Georgia Aff., 2 [#13].

[11] Pl.'s Mem., 3 [#4].

[12] See Thrasher Decl., Ex. A, 10 [#5] (containing section 13(f) of the Agreement). In addition, the Agreement allows either Party to terminate the Agreement upon not less than sixty days prior written notice, but certain sections, such as sections 8, 9, 12 and 13 survive any termination of the Agreement. Thrasher Decl., 5 [#5]; see Thrasher Decl., Ex. A, 9 [#5] (containing section 11).

[13] Thrasher Decl., Ex. A, 9 [#5] (containing section 12(f) of the Agreement).

violated its non-competition obligations and for any period required for litigation to enforce these obligations.[14]

The Agreement also required Defendant to agree that goodwill accrued solely to Plaintiff and that Plaintiff owned all rights, title, and interest to its products.[15] Additionally, Plaintiff retained ownership of all trade secrets and Defendant agreed not to disclose any "confidential information" without Plaintiff's prior written approval.[16] Moreover, during the time period of the Agreement, Defendant was not allowed to market, promote, or sell similar or competitive products within the Territory.[17]

B.    The Amendment to the Agreement and the Disputed Facts

Plaintiff became dissatisfied with Defendant's performance and sought an amendment to the Agreement to remove a number of customer accounts from Defendant's purview.[18] Hal Thrasher, Plaintiff's Director of Sales for North and South America,[19] notified Martin Georgia,

---

[14] Thrasher Decl., 3 [#5]. Plaintiff claims that this one-year limitation was essential because Defendant maintained direct relationships with Plaintiff's customers and Plaintiff needed one year to assess its needs and put a new distributor in place without the threat of Defendant taking advantage of Plaintiff's "marketplace transition." Thrasher Decl., 3 [#5].

[15] Thrasher Decl., 3 [#5]; see Id., Ex. A, 6, 10 [#5] (containing sections 9 and 13(g) of the Agreement). Plaintiff claims that this clause is necessary because it is easy to switch from one manufacturer's products to another, particularly in the "dryfilm business." Plaintiff, therefore, devotes substantial resources to maintaining goodwill with its customers. Id. at 2–3 [#5].

[16] Id. at 3 [#5]; see Id., Ex. A, 5–7 [#5] (containing sections 8 and 9 of the Agreement).

[17] Id. at 3 [#5]; see Id., Ex. A, 3–4 [#5] (containing section 6 of the Agreement).

[18] Pl.'s. Mem., 3 [#4].

[19] Thrasher Decl., 1 [#5].

the President and co-owner of Defendant,[20] of this decision and promised to send him a proposed

amendment to the Agreement for his review.[21]  Thrasher and Georgia did not discuss any further

details of the amendment.[22]  Thrasher e-mailed Georgia an electronic document that was a draft

letter amending the Agreement.[23]  Georgia inserted language into the document that removed the

non-competition provision[24] and sent at least one signed version back to Thrasher

("Amendment").[25]  Georgia expected Plaintiff and its legal staff to read the two-page document

and did not explicitly inform Plaintiff of the insertion.[26]  Plaintiff counter-signed without

knowledge that Georgia had made the changes and in reliance on the instructions that Plaintiff

provided to Defendant.[27]

The Parties dispute the exact instructions provided by Plaintiff when Plaintiff sent the

electronic document, and whether Defendant complied with those instructions.  Plaintiff claims

that Thrasher "advised" Georgia that if Georgia had any "proposed edits," then he should "mark

---

[20] Georgia Aff., 1 [#13].

[21] Thrasher Decl., 4 [#5]; see also Def.'s Ans., 2 [#11].

[22] Thrasher Decl., 4 [#5].  Defendant admits that Thrasher and Georgia did not discuss further details of the proposed amendment.  Def.'s Ans., 2 [#11].

[23] Thrasher Decl., 4 [#5].

[24] Georgia did so by writing "less section 12 f."  Georgia Aff., 6 [#13] (attaching Amendment to Distributor Agreement para. 5 [hereinafter Amendment]).  Section 12(f) is the non-competition provision in the original Agreement.  Thrasher Decl., Ex. A, 9 [#5] (containing section 12(f)).

[25] Georgia Aff., 3 [#13]; Thrasher Decl., 4 [#5].

[26] Georgia Aff., 3 [#13]; Thrasher Decl., 4 [#5].

[27] Thrasher Decl., 4 [#5].

up the document" and send it back "electronically" so that Plaintiff could approve or reject the proposed changes.[28]  If Georgia had no changes, he was "advised" to send two signed originals of the letter to Thrasher for Plaintiff to counter-sign.[29]   Defendant, however, claims that it did as instructed.  That is, Georgia inserted language into the electronic version of the proposed amendment removing the non-competition provision and mailed a signed version to Thrasher.[30]  Neither Party has produced the original e-mail correspondence between Thrasher and Georgia.

C.      Termination of the Agreement

Plaintiff, through the Amendment, re-assigned three major accounts from Defendant's responsibility to a competitor of Defendant's.[31]  In January 2010, Defendant notified Plaintiff that it intended to terminate the Agreement, effective March 11, 2010.[32]  Thrasher notified Georgia of

_____

[28] Thrasher Decl., 4 [#5].

[29] Thrasher Decl., 4 [#5].

[30] Georgia Aff., 3 [#13] ("I do not know how to create what I am told is called a 'red-lined' version of a document that would compare one draft to another.  I just did what I was told to do—make ECS's proposed edits in the Word document and mail it back.").  There are at least two ways of explaining Georgia's actions and motivation which would indicate that Georgia did not fail to comply with Thrasher's instructions, or at least would indicate the lack of a sharp dispute with regard to that issue.  First, since Plaintiff asked for an electronic mark-up for "proposed edits," Defendant might not have viewed its edits as "proposed" (that is, an offer, unconnected to Plaintiff's underlying amendment).  Rather, "[Georgia's edits] were a necessary component of accepting Plaintiff's amendments."  Georgia Aff., 3 [#13] ("[T]he new relationship proposed by [Plaintiff] only made business sense to me if [Defendant] was not constrained by a non-compete if the relationship ended.").  Second, Plaintiff did not require or demand that changes be made exclusively in its desired way (and there is no prior course of dealing to suggest as much).  Instead, Plaintiff merely "advised" that the changes be made a certain way.  Given the short length of the document and Plaintiff's legal staff, Defendant expected that any final document would be reviewed.  See Georgia Aff., 3 [#13].

[31] Georgia Aff., 3 [#7].

[32] Thrasher Decl., 5 [#5].

Defendant's non-competition obligations in the Agreement. In response, Georgia advised

Thrasher to look at the Amendment.[33] This was the first time that Thrasher became aware of the

phrase in the Amendment that had removed Defendant's non-competition obligations.[34]

Plaintiff has now been informed by customers that Defendant has arranged to sell a

competitor's products that are similar to and competitive with Plaintiff's product line.[35] At least

one customer has notified Plaintiff that he was going to stay with the existing distributor (that is,

Defendant) because Defendant told that customer that Plaintiff "fired" Defendant.[36]

Plaintiff allegedly wrote to Defendant to remind it of its obligations under the Agreement,

which include its non-competition obligations.[37] On February 9, 2010, Defendant allegedly

notified Plaintiff that it believed that it had no ongoing non-competition obligation and that

enforceability of the exclusion of section 12(f) was not affected by the fact that Defendant had not

provided Plaintiff notice of the change to that section.[38]

III.    Discussion

Despite the disagreement with regard to the facts, the Parties' competing versions of

events are not in sharp dispute such that the "propriety of injunctive relief hinges on

---

[33] Thrasher Decl., 5 [#5].

[34] Thrasher Decl., 5 [#5].

[35] Thrasher Decl., 5 [#5].

[36] Thrasher Decl., 5 [#5].

[37] Compl., 6 [#1]. Further, Plaintiff specifically stated that if Defendant intended to represent competitive products it would be in violation of its non-competition obligations. Id.

[38] Compl., 6 [#1]. Defendant denies that its February 9, 2010 letter made reference to not providing "notice of the change." Def.'s Ans., 3–4 [#11].

determinations of credibility."[39] Given the need to balance speed and practicality against accuracy and fairness, along with the First Circuit's reminder that "an evidentiary hearing is not an indispensable requirement when a court allows or refuses a preliminary injunction" under Federal Rule of Civil Procedure 65,[40] this court can proceed to rule considering the facts presented.[41]

As the Supreme Court has recently instructed, a "plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."[42]  In general, injunctive relief is "to be used sparingly, and only in a clear and plain case."[43]  The burden is on the moving party to

---

[39] Campbell Soup Co. v. Giles, 47 F.3d 467, 470 (1st Cir. 1995) (finding documentary evidence sufficient to permit a denial of injunctive relief because the parties had a fair opportunity to present relevant facts and arguments to the court and the extent to which material factual issues were genuinely in dispute was minimal).

[40] Campbell Soup, 47 F.3d at 470 (quoting Aoude v. Mobil Oil Corp., 862 F.2d 890, 893 (1st Cir. 1988)).

[41] See supra note 2.

[42] Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 374 (2008) (citations omitted).  This standard is similar to the First Circuit standard:

> [T]he propriety of preliminary injunctive relief depends on an amalgam of four factors: (I) the likelihood that the movant will succeed on the merits; (ii) the possibility that, without an injunction, the movant will suffer irreparable harm; (iii) the balance of relevant hardships as between the parties; and (iv) the effect of the court's ruling on the public interest.

Waldron v. George Weston Bakeries, Inc., 570 F.3d 5, 9 (1st Cir. 2009) (quoting Coquico, Inc. v. Rodriguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009)).

[43] Rizzo v. Goode, 423 U.S. 362, 378 (1976) (quoting Irwin v. Dixion, 50 U.S. (9 How.) 10, 33 (1850)).

8

establish that consideration of these factors supports the issuance of a preliminary injunction.[44]

Here, all four factors weigh in favor of denying the request for a preliminary injunction.

A.     Success on the Merits

The First Circuit has instructed that the "sine qua non of [the] four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."[45]  In this court's analysis, therefore, likelihood of success is the primary obstacle that Plaintiff must surmount.[46]

Plaintiff contends that it can establish likelihood of success on the merits in proving that Defendant's sale of competitive products breaches the non-competition provision of the Agreement.  Plaintiff alleges that the only argument available to Defendant is that the Amendment should be enforced to include the purported deletion of the non-competition obligation in the Agreement.  Plaintiff replies to this argument that the language deleting the non-competition obligation is unenforceable because it was placed there deceitfully and does not express the intentions of the Parties.[47]  Moreover, enforcing the non-competition provision is an appropriate

---

[44] TriMark USA, Inc. v. Performance Food Group Co., LLC, 667 F. Supp. 2d 155, 159 (D. Mass. 2009); see Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).

[45] New Comm Wireless Servs. v. Sprintcom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).  But see infra notes 108–10 and accompanying text (explaining that the second factor may weigh as heavily in a court's analysis).

[46] See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996) ("Likelihood of success is the main bearing wall of the [preliminary injunction] four-factor framework.").

[47] Pl.'s Mem., 8 [#4].

remedy for Defendant's deceit.

Plaintiff's arguments fail for the following reasons.

### 1.    Is the Amendment Unenforceable?

Plaintiff contends that Defendant's Amendment to the Agreement is unenforceable for two reasons.  First, Defendant's Amendment was an act of fraud and deceit.[48]  Second, Defendant's act was a breach of contract.[49]  Both of Plaintiff's contentions fail, for the reasons explained below.

### a.    Fraud and Deceit

Plaintiff contends that Defendant committed fraud and deceit.  Specifically, Plaintiff contends that the Parties agreed to amend the Agreement for the single narrow purpose of modifying Defendant's customer list, and Defendant had the intent to deceive because it did not notify Plaintiff of the change in the non-competition obligations.[50]  Plaintiff also claims that there was no discussion of or agreement to modify or remove Defendant's non-competition obligations as part of the Amendment.[51]  Plaintiff argues that Defendant should have flagged for Plaintiff any proposed changes and that by returning a signed Amendment, Defendant was indicating to Plaintiff that it had made no changes.[52]  By proceeding in this manner, Defendant allegedly

---

[48] Pl.'s Mem., 8–11 [#4].

[49] Pl.'s Mem., 11–12 [#4].

[50] Pl.'s Mem., 9 [#4].

[51] Pl.'s Mem., 9 [#4].

[52] Pl.'s Mem., 9–10 [#4].

expected that Plaintiff would possibly overlook the alteration.[53]

The tort of deceit requires a showing "that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage."[54]  A failure to disclose materials facts may constitute a false representation if a duty to disclose exists.[55]

Plaintiff is not likely to succeed on the merits of proving that Defendant committed fraud or deceit because Plaintiff has failed to show that Defendant violated a duty to disclose. Additionally, Plaintiff has failed to show that Defendant (a) made a false representation or (b) had a duty to disclose.

If there is no evidence of intent to deceive or of a misleading statement,[56] and the terms "are expressed in the body of [the contract] in a way not calculated to escape attention," then the "law presumes, in the absence of fraud or imposition, that [a party] did read it, or was otherwise informed of its contents, and was willing to assent to its terms without reading it."[57]  This general presumption appears particularly appropriate for a case where a party should expect further revisions by another party, as is the case here, where Plaintiff sent an Amendment initiating a

---

[53] Pl.'s Mem., 9–10 [#4].

[54] Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982) (quoting Barrett Assocs. v. Aronson, 346 Mass. 150, 152 (1963)).

[55] 17A Massachusetts Practice Series, Bishop § 29.1 at 309 (5th ed. 2005).

[56] Thrasher's affidavit does not point to any particular false or misleading statement, an intent to deceive, or an inducement of Plaintiff to not read the document.

[57] Grace v. Adams, 100 Mass. 505, 507 (1868).

substantial reduction of Defendant's business by removing three accounts.

First, even if Defendant was possibly under a duty to disclose, Defendant did not violate its duty. The duty to disclose requires the exercise of "reasonable care."[58] Although Defendant did not follow Plaintiff's advised or requested directions (to send changes electronically or in a Word document), Defendant still produced a document that did not conceal or hide the changes. In fact, the changes in the Agreement were there for Plaintiff to read.[59] Plaintiff and its attorneys had a chance to review the changes before agreeing to the Amendment.[60] Plaintiff therefore has not shown that Defendant would likely be subject to liability for not exercising reasonable care.

Second, and more importantly, Plaintiff was not under a duty to disclose. Plaintiff's intimation that section 551 of the Restatement (Second) of Torts applies in this case is not supported by the case law.[61] Plaintiff supports this intimation by citing to Nota Construction

---

[58] Restatement (Second) of Torts § 551 cmt. d (1977).

[59] Cf. Cambridge N. Point, LLC v. Boston & Maine Corp., C.A. No. 3451-VCS, 2010 Del. Ch. LEXIS 135, at *40 (Del. Ch. June 17, 2010) ("If it is deceptive to be unsubtle, if it is concealment to put something right in an adversary's face, then those concepts have become their own antonyms.").

[60] Cf. Restatement (Second) of Torts § 551 cmt. d (1977) ("If reasonable care is exercised, the fact that the information does not reach the person entitled to it does not subject him to liability.")

[61] Section 551 of the Restatement (Second) of Torts provides in, relevant part:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to

Corp. v. Keyes Associates,[62] in which a plaintiff subcontractor claimed misrepresentation and deceit in an architect's prepared plans and specifications. The Nota court recognized that it was possible for a jury to find that potential bidders were relying on the architect and that the architect in turn had a duty to notify potential bidders of specific information.[63] Nota, however, is distinguishable from this case.[64]

Subsections 2(b) and 2(e) of section 551 the Restatement (Second) of Torts, which Nota quoted, are inapplicable here, even accepting Plaintiff's version of the disputed facts. Subsection

---

disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts § 551 (1977).

[62] 45 Mass. App. Ct. 15 (1998).

[63] Id. at 19–21.

[64] See infra note 66.

13

2(b) attaches a duty to disclose matters known to one that are necessary to prevent a partial or ambiguous statement of fact from being misleading.[65]  Subsection 2(b) is not applicable because Plaintiff has not alleged any misleading statement of fact made by Defendant.[66]  Subsection 2(e) is also inapplicable.  Subsection 2(e) creates a duty if a party knows that the other party is going to enter into the transaction based upon a mistake as to basic facts.[67]

Neither the Restatement commentary[68] nor Justice Qua's classic formulation of the non-disclosure duty in <u>Swinton v. Whitinsville Savings Bank</u>[69] supports Plaintiff or the application of subsection 2(e).  Defendant did not, for instance, take advantage of Plaintiff's ignorance in a

---

[65] <u>See</u> Restatement (Second) of Torts § 551(2)(b) (1977).

[66] <u>See</u> <u>Evergrass, Inc. v. Town of Lexington</u>, 03-1207, 2004 Mass. Super. LEXIS 27, at *21 (Mass. Supp. Jan. 16, 2004) (distinguishing <u>Nota</u>, where the plaintiff had "identified with precision a statement of fact, on a matter clearly material to the bids, while the plaintiffs here [in <u>Evergrass</u>] rel[ied] on an amorphous theory, unrelated to any specific statement of fact, for which they offer[ed] no evidence. <u>Nota</u> does not assist this claim, but merely illustrates the type of specific allegations these plaintiffs have failed to make.").

[67] <u>See</u> Restatement (Second) of Torts § 551(2)(e) (1977).

[68] Restatement (Second) of Torts § 551 cmt. l (1977).

[69] 311 Mass. 677, 678 (1942) ("There is no allegation of any false statement or representation, or of the uttering of a half truth which may be tantamount to a falsehood. There is no intimation that the defendant by any means prevented the plaintiff from acquiring information as to the condition of the house. There is nothing to show any fiduciary relation between the parties, or that the plaintiff stood in a position of confidence toward or dependence upon the defendant. So far as appears the parties made a business deal at arm's length. The charge is concealment and nothing more; and it is concealment in the simple sense of mere failure to reveal, with nothing to show any peculiar duty to speak. The characterization of the concealment as false and fraudulent of course adds nothing in the absence of further allegations of fact." (citations omitted)).

shocking or extreme manner.[70] Rather, Plaintiff was a large, sophisticated business with legal counsel, which had initiated the Amendment. Unlike in the Nota case, there was no false statement or other act preventing Plaintiff from acquiring information as to Defendant's change in the Agreement or Amendment. Rather, Plaintiff and Defendant were experienced companies engaging in a negotiation at arm's length. In sum, the law in Massachusetts reveals no duty to disclose under such circumstances.[71]

Plaintiff relies mostly on a Court of Appeals of Wisconsin case, Hennig v. Ahearn,[72] which held that the evidence supported claims for intentional misrepresentation and reformation of the contract.[73] In that case, Hennig negotiated an employment agreement with Ahearn.[74] At the last minute, Ahearn altered a crucial provision in the final draft of the agreement but failed to point

---

[70] See Restatement (Second) of Torts § 551 cmt. l (1977) ("In general, the cases in which the rule stated in Clause (e) has been applied have been those in which the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware. In such a case, even in a tort action for deceit, the plaintiff is entitled to be compensated for the loss that he has sustained.").

[71] Greenery Rehabilitation Group v. Antaramian, 36 Mass. App. Ct. 73, 78 (1994) (finding no duty and explaining that the "Restatement concludes that nondisclosure can be actionable only where there is a 'duty' to disclose, and a duty arises only in a number of discrete situations described in § 551").

[72] 601 N.W.2d 14 (Wis. Ct. App. 1999).

[73] Id. at 25–27.

[74] Id. at 17.

15

out the alteration.[75]  Hennig and his attorney did not notice the crucial alteration.[76]  Hennig signed the contract and, as a result, received substantially less compensation than he expected.[77]  The Wisconsin court, with reference to section 551 of the Restatement, determined that the conduct of the parties could give rise to a duty on Ahearn's part to point out his alterations in the agreement.[78]

But Hennig lacks persuasive force here for three reasons.  First, Plaintiff points to no Massachusetts court that has applied Hennig.  Second, the contract in Hennig was the product of a "long negotiation" during which alterations were expressly discussed among the parties and highlighted in successive drafts.[79]  No such extensive course of dealing existed here.  The critical ingredient for subsection 2(e) that gives rise to a duty of disclosure—that the mistaken party reasonably expects disclosure—is therefore absent here.  Third, unlike in Hennig, neither Party's version of the facts implicates a duty to disclose.[80]

---

[75] Id.  The custom during the course of the negotiation had been to point out alterations in each draft of the agreement.  Id.

[76] Id. at 18.

[77] Id.

[78] Id. at 23.  The court found that a jury could conclude that Ahearn had engaged in a form of swindling.  Id.  Moreover, the Hennig court held that Hennig's reliance on Ahearn's conduct would be justified absent a showing that the change in the agreement was obvious.  Id. at 24.

[79] Id. at 23.

[80] See id. at 23 ("If there are disputed facts bearing upon the existence of the duty, as for example the defendant's knowledge of the fact, the other's ignorance of it or his opportunity to ascertain it, the customs of the  particular trade, or the defendant's knowledge that the plaintiff reasonably expects him to make the disclosure, they are to be determined by the jury under

Plaintiff alleges that Defendant engaged in fraud.[81]  Presumably Plaintiff is referring to fraud in the inducement.  Plaintiff still has not shown a substantial likelihood of prevailing on the merits of this claim.  Establishing fraud in the inducement requires establishing the elements of common law deceit,[82] which, as explained above, Plaintiff has failed to show.[83]

                        b.       <u>Breach of Contract</u>

Plaintiff has also asserted a breach of contract claim.  Insofar as Plaintiff's contract claim is tied to Plaintiff's claim for fraud and deceit,[84] Plaintiff is not likely to succeed on the merits.  Namely, Plaintiff has not shown that Defendant engaged in fraud or deceit or otherwise breached its duties or obligations to Plaintiff so as to violate its contract.

Plaintiff asserts in its Complaint that Defendant has also breached a part of its Agreement by not paying for all products that Plaintiff delivered to Defendant.[85]  Plaintiff, however, has not established that it is likely to succeed on the merits of this claim for two reasons.  First, Plaintiff does not make this particular argument (regarding money owed by Defendant) in its <u>Motion for</u>

---

appropriate instructions as to the existence of the duty." (quoting Restatement (Second) of Torts § 551 cmt m. (1977))).

[81] <u>See, e.g.</u>, Pl.'s Mem., 8 [#4].

[82] <u>Commerce Bank & Trust Co. v. Hayeck</u>, 46 Mass. App. Ct. 687, 692 (1999) (quoting <u>Hogan v. Riemer</u>, 35 Mass. App. Ct. 360, 365 (1993)).

[83] <u>See</u> <u>supra</u> notes 65–80 and accompanying text; <u>cf.</u> <u>Cambridge N. Point, LLC.</u>, 2010 Del. Ch. LEXIS 135, at *40.

[84] <u>See</u> Compl., 7 [#1].

[85] <u>See</u> Compl., 7 [#1] (alleging that Defendant owes Plaintiff $76,988.08 for products that Plaintiff delivered to Defendant for sale to customers).

Preliminary Injunction or Memorandum in Support of the Motion. Given that the Parties have not argued this point, this court has an insufficient basis to adjudicate this argument. Second, even considering Plaintiff's argument, any such potential breach here could be remedied by calculable damages and would appear not relevant to the issue of an equitable remedy such as an injunction.

c. Other Claims

Plaintiff brings a number of other counts against Defendant. Plaintiff does not discuss these claims or counts in its Motion or Memorandum in Support, but this court will briefly address them.

Plaintiff brings a claim for breach of implied covenant of good faith and fair dealing against Defendant. Establishing a violation of the covenant of good faith and fair dealing requires at least bad-faith conduct.[86] Although there is no single test for determining bad-faith conduct, courts have expressed a "variety of formulations to describe bad faith conduct."[87] A showing of bad faith requires dishonest purpose, conscious wrongdoing, or unfairness beyond bad judgment or failing to abide by the terms of a contract.[88] Moreover, Massachusetts courts do not allow the implied covenant of good faith and fair dealing to substitute for a party's failure to negotiate the terms that it desires.[89]

---

[86] Sonoran Scanners, Inc. v. Perkinelmer, Inc., 585 F.3d 535, 541 (1st Cir. 2009) (citing First Circuit and Massachusetts case law).

[87] Sonoran Scanners, Inc. v. Perkinelmer, Inc., 590 F. Supp. 2d 196, 208 (D. Mass. 2008) (collecting cases), rev'd on other grounds, 585 F.3d at 546–47.

[88] Id.

[89] Uno Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 389 (2004).

Plaintiff has not produced sufficient evidence to support a finding that Defendant acted in bad faith in deviating from Plaintiff's suggested course of action and modifying the Agreement.

Plaintiff also alleges a claim for unfair competition under chapter 93A of the Massachusetts General Laws. To prove an unfair competition claim under chapter 93A, a plaintiff "must establish that the alleged offending act was (1) within at least the penumbra of common law, statutory law or other established concepts of unfairness, (2) is immoral or otherwise unscrupulous, and (3) inflicted injury on another business."[90] In assessing claims of unfairness, the Massachusetts courts have applied what is commonly known as the "rascality" test: the "'objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce.'"[91] A breach of a contract alone does not amount to a unfair act or practice under section 2 of chapter 93A of the Massachusetts General Laws.[92]

Plaintiff has failed to establish that Defendant's actions rise to the level of unfairness necessary for chapter 93A. As explained above, sophisticated businesses modifying a contract are expected to read the documents submitted from each side. Plaintiff presents no legal or commercial notion of unfairness under which Defendant's actions are unfair, particularly under chapter 93A or otherwise. Plaintiff therefore has not shown a likelihood of success on its unfair

---

[90] <u>Franklin v. Ciroli</u>, 865 F. Supp. 940, 947 n.18 (D. Mass. 1994).

[91] <u>Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.</u>, 884 F.2d 1510, 1513 (1st Cir. 1989) (quoting <u>Levings v. Forbes & Wallace</u>, 8 Mass. App. Ct. 498, 504 (1979)). <u>But see</u> <u>Mass. Emp'rs Ins. Exch. v. Propac-Mass, Inc.</u>, 420 Mass. 39, 43 (1995) (noting that the rhetoric of "rascality" is "uninstructive").

[92] <u>Whitinsville Plaza, Inc. v. Kotseas</u>, 378 Mass. 85, 99–100 (1979).

competition claim.

        d.     <u>Reform Contract on Fraud and Mistake</u>

Contract reformation is an appropriate equitable remedy if fraud, mistake, accident, or illegality exists.[93] The general rule in Massachusetts is that "reformation of an instrument may be warranted not only by fraud or by mutual mistake, but also by a mistake of one party which is known to the other party."[94]

Plaintiff has not shown a likelihood of success on its claim for contract reformation based upon fraud or mistake for a few reasons. First, Plaintiff has not satisfied the Massachusetts rule such to warrant reformation of the contract. Plaintiff has not presented evidence of fraud, mutual mistake, or that Defendant was aware of Plaintiff's mistake. Second, for the reasons discussed above, Plaintiff's reliance on <u>Hennig</u> is misplaced.[95] Third, given the above findings, it is

---

[93] <u>Beaton v. Land Court</u>, 367 Mass. 385, 392 (1975).

[94] <u>Torrao v. Cox</u>, 26 Mass. App. Ct. 247, 251 (1988).

[95] Plaintiff's analogy to <u>Hennig</u> here is specifically inapt because the second and third elements in <u>Hennig</u> are not met in this case. The <u>Hennig</u> court determined that reformation of Hennig's contract was appropriate so long as Hennig could show: (1) that he mistakenly believed that the final version of the contract represented the terms to which he had agreed; (2) Ahearn knew that Hennig was mistaken about the contents of the final version of the contract but failed to correct him; and (3) the alteration was not apparent on a cursory examination of the agreement. <u>See</u> 601 N.W.2d at 27. The second element is not met here because there is no evidence that Defendant knew that Plaintiff was mistaken about the contents of the final version of the Amendment. Even assuming the truth of Plaintiff's bare allegations that Defendant may have been aware of Plaintiff's mistake, <u>see</u> Compl., 4–5 [#1], the third element is also missing because the alteration was apparent on a cursory examination of the short Amendment. <u>See</u> Georgia Aff., 6 [#13].

inappropriate for this court to rewrite a contract executed freely by two sophisticated parties.[96]

### 2. Enforceability of the Non-Competition Provision

Plaintiff also contends that the non-competition provision is enforceable because it protects Plaintiff's legitimate business interests and is reasonable in scope and duration. Plaintiff argues that it will suffer immediate irreparable harm because Defendant will sell to customers with whom Plaintiff has accrued goodwill over the course of Plaintiff's and Defendant's relationship.[97] Plaintiff also claims that Defendant is obligated to not disclose Plaintiff's confidential information.[98]

Under Massachusetts law, non-competition agreements are enforceable to the extent that they protect legitimate business interests and are reasonable in scope.[99] The Supreme Judicial Court has explained, however, that a "covenant not to compete designed to protect a party from ordinary competition does not protect a legitimate business interest."[100] A party seeking to

---

[96] See Blue Hills Office Park LLC v. J.P. Morgan Chase Bank, 477 F. Supp. 2d 366, 377 (D. Mass. 2007) ("[W]here sophisticated parties choose to embody their agreement in a carefully crafted document, they are entitled to and should be held to the language they chose. . . . It is no appropriate part of judicial business to rewrite contacts freely entered into between sophisticated business entities." (quotation marks and citations omitted)).

[97] Pl.'s Mem., 12–15 [#4].

[98] Pl.'s Mem., 12–15 [#4]. Plaintiff also contends that both the time period limitation of one year is reasonable and applying the restriction to some of Defendant's former customers is also reasonable. Pl.'s Mem., 12–15 [#4]. This court need not address the reasonableness of the scope and duration of the non-competition provision given its lack of enforceability.

[99] See Boulanger v. Dunkin' Donuts, Inc., 442 Mass. 635, 639 (2004); Shipley Co. v. Kozlowski, 926 F. Supp. 28, 30 (D. Mass. 1996).

[100] Boulanger, 442 Mass. at 641.

enforce a non-competition provision a must show some additional interest, such as protection of

confidential information.[101]  Whether information is confidential is not subject to a clear rule, but

Massachusetts courts have provided six guiding factors:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.[102]

Plaintiff's argument that Defendant is violating a covenant protecting its legitimate

business interests fails for two reasons.  First, Plaintiff puts the cart before the horse by presuming

that the information at issue is confidential.  Plaintiff does not provide evidence or sufficiently

explain how the information in Defendant's possession constitutes protected trade secret or

confidential trade information.[103]  Plaintiff does not, for instance, explain how that subject matter

is unknown to others, nor does Plaintiff show that it pursued an "active course of conduct

---

[101] Id. at 641–42.

[102] Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972).  Jet Spray discussed the factors in the context of trade secrets.  But the two categories—trade secrets and confidential information—can be treated the same for purposes of this discussion.  See Boulanger v. Dunkin' Donuts, Inc., 02-1169, 2003 Mass. Super. LEXIS 248, at *6 (Mass. Sup. June 9, 2003).

[103] Plaintiff merely points to Defendant's possession of Plaintiff's "know-how" and customer list and that Defendant is exploiting Plaintiff's goodwill with its customers.  Pl.'s Mem., 2, 15–16 [#4].  Plaintiff's citation here to Shipley Co. v. Clark misses the mark because the defendants in Clark admitted that they were violating the non-competition covenants at issue.  728 F. Supp. 818, 825 (D. Mass. 1990) (Tauro, J.) (issuing a preliminary injunction against two former salesmen enjoining them from working for a competitor or soliciting their former employer's customers).  Similarly, the plaintiffs in Borden & Remington Corp. v. Banisch pointed to specific information that allowed the court to conclude that there was confidential information at issue.  A99-01279, 1999 Mass. Super. LEXIS 477, at * 9 (Mass. Sup. Oct. 18, 1999).

designed to inform" others that the information was to remain confidential.[104]  Plaintiff's desires or "unexpressed intentions" regarding confidentiality "cannot bind" the Defendant.[105]  Moreover, the non-competition requirement is not enforceable because Thrasher's affidavit is silent on any legitimate purposes of the non-competition provision, other than conclusory statements regarding protecting goodwill.

Second, Plaintiff has failed to show that the prior non-competition provision is valid and should be enforced by this court.  There was no meeting of the minds that the non-competition provision would continue after the Amendment.[106]

In sum, Plaintiff has failed to show that it will likely succeed on the merits.[107]

B.       Irreparable Harm

For a court to grant injunctive relief, a party must show that ongoing or future irreparable

---

[104] Jet Spray Cooler, Inc., 361 Mass. at 841–42 (emphasis added).  If Plaintiff thought information given to Defendant was confidential, then that thought had to be "expressed or otherwise brought to the attention of the defendant."  Id. at 841.

[105] Id. at 841.

[106] Indeed, the Amendment made no business sense without removing the non-competition requirement.  Georgia Aff., 3 [#13].

[107] Moreover, when courts are faced with affidavits at odds and must make a credibility determination between them, courts generally do not issue a preliminary injunction, but rather leave the issue for a jury to resolve.  See, e.g., Spencer Co. v. Armonk Indus., Inc., 489 F.2d 704, 707 (1st Cir. 1973) (affirming the refusal to issue a preliminary injunction as an appropriate exercise of discretion considering a "major factual dispute"); see also Am. Century Home Fabrics, Inc. v. Ashley Furniture Indus., 473 F. Supp. 2d 168, 175 (D. Mass. 2007) (Tauro, J.) ("[W]ithout reliable evidence procured through discovery and cross examination, the court has no meaningful basis from which to conclude that Plaintiff is sufficiently likely to prevail [such] that a preliminary injunction would be justified.").

23

injury is likely in the absence of an injunction.[108]  This factor weighs heavily in the analysis as well.[109]  In fact, irreparable harm is "the essential prerequisite for equitable relief."[110]  Normally, "the fact of a relatively small and precisely quantifiable injury is sound evidence that preliminary equitable relief is not warranted since just such injuries can be remedied adequately by final judgment."[111]

Plaintiff claims that it will suffer irreparable harm absent an injunction because Defendant is appropriating Plaintiff's goodwill from its relationships with its customers and providing knowledge of Plaintiff's customers to Plaintiff's competitor.[112]  Plaintiff argues that the non-competition provision is meant to allow a reasonable period of time for Plaintiff to find a new distributor to manage sales to these customers without the relationships being appropriated.[113]  Plaintiffs also claims that the loss of goodwill and potential appropriation of confidential information is irreparable and injunctive relief is appropriate to prevent it.[114]

---

[108] Winter, 129 S. Ct. at 375; see also Los Angeles v. Lyons, 461 U.S. 95, 103 (1983). Note that the First Circuit phrases this factor as "the possibility that, without an injunction, the movant will suffer irreparable harm."  Braintree Labs., Inc. v. Citigroup Global Mkts. Inc., 622 F.3d 36, 40 (1st Cir. 2010).  But even under this view, Plaintiff fails to show that the factor weighs in favor of issuing an injunction because Plaintiff has not made a sufficient "positive showing of irreparable harm."  Id. at 43.

[109] Braintree Labs., Inc., 622 F.3d at 41 (noting that the first two factors weigh "heaviest in the analysis").

[110] Id. (quoting Gonzalez-Droz v. Gonzalez-Colon, 573 F.3d 75, 79 (1st Cir. 2009)).

[111] Burlington v. Dep't of Educ., 655 F.2d 428, 432 (1st Cir. 1981).

[112] Pl.'s Mem., 15–16 [#4].

[113] Pl.'s Mem., 16 [#4].

[114] Pl.'s Mem., 16 [#4].

Plaintiff has failed to show that it is likely to suffer irreparable harm for several reasons. First, Plaintiff's losses are quantifiable and relatively small. Defendant's business constituted two million dollars a year of Plaintiff's total business and Plaintiff is a fifty-billion-dollar company.[115] Second, the threat of Defendant selling to Plaintiff's customers and Plaintiff being unable to respond is not an immediate threat because the Plaintiff has been transitioning to a different distributor since 2008.[116] Third, although it is true that the loss of goodwill is not easily quantified,[117] Plaintiff does not explain how Defendant is appropriating Plaintiff's goodwill and confidential information. Plaintiff presents conclusory allegations[118] and Thrasher's often "conclusory affidavit."[119] But Plaintiff does not specify the type of confidential information that Defendant obtained.[120] Additionally, Plaintiff may have goodwill in its relationships with customers, but Plaintiff has not explained how an injunction will affect the reputation that Plaintiff has with its customers for "promptness, fidelity[,] and integrity."[121] Moreover, even assuming

---

[115] Georgia Aff., 2 [#13].

[116] Georgia Aff., 5 [#13]. Plaintiff does not deny this point.

[117] See, e.g., Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 20 (1st Cir. 1996).

[118] Pl.'s Mem., 16 [#4].

[119] Braintree Labs., 622 F.3d at 42.

[120] See Borden & Remington Corp. v. Banisch, 1999 Mass. Super. LEXIS 477, at *9 (explaining the information on prices, pricing strategies, identities of customers, and general marketing places was not likely to be known outside of the contracting parties and was highly valuable to competitors). Plaintiff never claims, for instance, that its customer list is confidential information or that Defendant is appropriating its pricing strategies.

[121] Kroeger v. Stop & Shop Companies, Inc., 13 Mass. App. Ct. 310, 316 (1982). Plaintiff, at most, claims that one customer was told that Plaintiff "fired" Defendant. Compl., 6

that any customers who remain with Defendant do so as a result of Defendant's improper solicitation,[122] such a loss of customers (or customer goodwill) do not necessarily constitute irreparable injury.[123]

Plaintiff has not made a sufficient showing that Defendant's actions will result in a loss of goodwill or confidential information.[124]

C.     Balance of Equities

The balance of equities tilts in favor of Defendant. That is, Plaintiff has not demonstrated that the status quo harm to Plaintiff would outweigh the harm to Defendant if this court issues an injunction.

In addition to Plaintiff's argument that it will suffer a loss of goodwill, Plaintiff argues that

---

[#1]. Beyond the assumed untruthfulness of the statement that Plaintiff fired Defendant, Plaintiff does not allege how this or other actions by Defendant are impugning Plaintiff's reputation for promptness, fidelity, and integrity.

[122] See Compl., 6 [#1].

[123] See, e.g., Ikon Office Solutions, Inc. v. Belanger, 59 F. Supp. 2d 125, 132 (D. Mass. 1999) (finding the loss of customer goodwill not necessarily irreparable and an adequate remedy at law because the "loss of revenue is calculable through evidence of past earnings on the accounts and, if necessary, through the use of expert testimony"); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop, 839 F. Supp. 68, 75 (D. Me. 1993) ("Loss of good will is frequently valued and recompensed in litigation. There is shown to be no pattern of insufficiency in such damage awards or any systemic obstacles to their fruition.").

[124] Plaintiff has not met its burden of establishing a right to obtain injunctive relief. See Clark, 728 F. Supp. at 827 n.24 (D. Mass. 1990). Moreover, Plaintiff's failure on the first factor and the lack of a likelihood that it has an enforceable interest in the non-competition provision does not ease its burden on the second factor. See Ross-Simons, 102 F.3d at 19 (noting that predicted harm and likelihood of success on the merits are to be juxtaposed and weighed in tandem).

injunctive relief would not constitute "undue hardship" for Defendant.[125]  According to Plaintiff, Defendant could still distribute these products outside the Territory, or could distribute any other products anywhere.[126]

But Plaintiff's argument overstates the harm to itself and understates the harm to Defendant by overlooking the nature of Defendant's business.  An injunction would be devastating to Defendant's business and employees.  It would require Defendant to lay off all three of its employees and potentially shut down business, and it would put Georgia's home and assets in jeopardy.[127]  Moreover, there is lack of a comparable risk to Plaintiff given Plaintiff's size and wealth.[128]  Measured both comparatively and absolutely, therefore, Plaintiff has not shown that its loss, even including the unspecified allegations of loss of goodwill, outweighs devastating Defendant's business.

D.    Public Interest

Plaintiff contends that the public interest is best served by issuing the injunction because, by requiring Defendant to honor its contractual obligations, it would not reward deceitful conduct.

This court finds that the public interest weighs in favor of Defendant.  Namely, it is not in

---

[125] Pl.'s Mem., 17 [#4].

[126] Pl.'s Mem., 17 [#4].

[127] Georgia Aff., 4–5 [#13].

[128] Georgia Aff., 2 [#13].

the public interest to put a small company out of business.[129]

IV.    Conclusion

        As explained above, Plaintiff has neither shown that it is likely to succeed on the merits

nor that it likely faces irreparable harm.  Moreover, the balance of equities tips in favor of

Defendant and an injunction is not in the public interest.  Plaintiff's Motion for Preliminary

Injunction [#3] is therefore DENIED.

AN ORDER HAS ISSUED.


                                              /s/ Joseph L. Tauro
                                          United States District Judge

---

        [129] Additionally, Plaintiff's citations to Judge Harrington's decisions in New Eng. Circuit
Sales v. Randall, No. 96-10840-EFH, 1996 U.S. Dist. LEXIS 9748 (D. Mass. June 4, 1996), and
Shipley Co., L.L.C. v. Kozlowski, 926 F. Supp. 28 (D. Mass. 1996), are not on point in two
ways.  First, the court in both Randall and Kozlowski enforced a non-competition provision
against a former employee who had clearly violated a non-competition provision.   Second,
neither case involved the issue of a non-competition provision being rescinded by a freely
executed amendment between two sophisticated parties.  In this respect, it is as much true here
that it "is in society's best interest to recognize and enforce agreements which were voluntarily
entered into and accepted."  See Kozlowski, 926 F. Supp. at 30; Randall, 1996 U.S. Dist. LEXIS
9748, at *9.  The voluntary agreement here is the Parties' two-page document rescinding the non-
competition provision.